### WILSON v. NEW YORK MILLS.

(Supreme Court, Appellate Division, Fourth Department. July 6, 1905.)

INJURY TO EMPLOYÉ—CONTRIBUTORY NEGLIGENCE—EVIDENCE.

A verdict for plaintiff for death of an employé of defendant from getting in the wheel of defendant's engine cannot be sustained where it is a mere conjecture whether the accident was due to the insufficient guard rail or to decedent carelessly approaching too near the wheel; the rule that freedom from contributory negligence must be shown not being changed by the Employer's Liability Act, Laws 1902, p. 1748, c. 600, § 3, declaring that the question whether the employé was guilty of contributory negligence shall be one of fact, subject to the usual powers of the court to set aside a verdict contrary to the evidence.

[Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Master and Servant, § 908.]

Appeal from Trial Term, Oneida County.

Action by Louisa M. Wilson, administratrix of Raymond Ochsner, against the New York Mills. From a judgment on a verdict for plaintiff and from an order denying a new trial, defendant appeals. Reversed.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, HISCOCK, and STOVER, JJ.

William Kernan, for appellant.
M. H. Sexton, for respondent.

SPRING, J.   The plaintiff's intestate, a young man about 19 years of age, was caught in a pulley wheel in the wheelroom of the defendant's mill on the morning of February 10, 1903, and instantly killed.   He had been in the employ of the defendant about eight or nine months as assistant engineer.   The pulley wheel was in one end of the wheelroom, and was seven feet three inches in diameter and three feet one inch wide, carrying a three-foot belt, and revolved from north to south at the rate of 156 revolutions a minute. The lower portion of the wheel revolved in a pit which was below the floor of the wheelroom and below the platform or pier.   In this wheel were two rows of spokes which were fastened to the rim of the wheel about nine inches from its edge.   This large pulley wheel was hung so that there was a space of two or three inches between the rim of the wheel and the edge of the platform.   The platform was built of brick, eight or nine feet long, three feet wide, and was eighteen inches high above the floor of the room, and extended parallel with the large pulley wheel above described, and the portion of the large pulley wheel above this platform was about four feet.   This pulley wheel was hung on a long shaft which was fastened on the east side, opposite the platform, to the wall of the room, and which extended from thence through the wheel as its axis, over the platform, through a smaller wheel, and thence to the large water wheel in the center of the room.   Where this shaft passed over this brick platform was a bearing which was about fourteen inches above the platform, and which rested in an oil pan which was two feet long and came up flush with the edge of the platform towards the large pulley wheel.   On top of this bearing were two oil or grease cups, and it was part of the duties of the deceased to place oil or grease in these cups.   This platform extended practically north and south.   On the other side of the platform, and hung on this same shaft, which was the axis of the large pulley wheel, was a smaller pulley wheel, which hung within five inches of the edge of the platform.   North from the platform, on the floor of the room, was a grease barrel, and at the other end of the platform were stairs which extended up to a landing by which entrance was had into the engine room of the mill, so that this platform formed a passageway which was constantly used by employés in going to and from the engine room.   The room was comparatively well lighted.   The large pulley wheel above referred to was guarded by means of a rail nine feet long, three and one-half inches wide, and one and three-fourths inches thick, which was hung across the front of the wheel and along the edge of this platform twenty-six inches above the floor of the platform, and was nailed at one end to an upright post and at the other fastened into an iron angle.   Along the edge of the platform from the shafting to the stairs leading up to the engine room was a strip of wood three inches high, which was placed upon the floor of this platform, but from the shafting to the other end of the platform, towards the north, there was no strip of wood, or any other guard rail except the one first above mentioned. It was the duty of the deceased to place oil or grease in these grease cups above the bearing above described at certain times during the

day, and shortly after 8 o'clock on the morning of the accident he was seen with a pail in his hand getting grease out of the grease barrel which stood on the floor of the room a few feet from the northerly end of the brick platform. That was the last time he was ever seen alive. About five minutes thereafter the upper part of his body was found on its back on the platform north of the shafting, and between the shafting and the grease barrel with the head towards the shafting and about a foot from the small pulley wheel. The legs were found in the bottom of the pit underneath the large pulley wheel, and portions of his body were found on the inside of the rim of this large wheel. The grease pail was standing on the platform on the other side of the shafting from the body, and nearer the small pulley wheel above mentioned than the one by which he evidently met his death. The guard rail which had been in front of and protecting the large wheel was found on the floor of the room, torn forcibly from its fastenings.

The above is practically all the proof there was of the accident, except certain side lights, to wit, that he was young, active, had shortly before been married, had no domestic troubles, was of a happy disposition; and on behalf of the defendant that on a previous occasion, while in the engine room, the engineer had told him to be vary careful, or he would get hurt, at a time when he was standing in close proximity to some of the machinery there in the engine room. There was no evidence as to whether or not he had filled the grease cups with grease before he was killed. It may be said that there was sufficient evidence of the defendant's negligence, and also that the question of the assumption of the risk by the intestate was properly submitted to the jury. We think, however, there was a total absence of tangible facts from which the jury might determine how the accident occurred. It is as reasonable to infer that decedent carelessly approached too near the end of the brick pier, and his clothing was caught by the rapidly revolving wheel, as to conclude that he fell in the wheel because there was no guard rail close to the end of the platform. Any conclusion reached depended wholly upon speculation and conjecture. Undoubtedly, where there is no eyewitness of the accident, and death results, slight evidence will exonerate the decedent from the charge of want of care; yet there must be some proof—some facts—justifying the inference that contributory negligence may not be imputed to him. Scheir v. Quirin, 77 App. Div. 624–628, 78 N. Y. Supp. 956, affirmed 177 N. Y. 568, 69 N. E. 1130; Goodhines v. Chase, 100 App. Div. 87, 91 N. Y. Supp. 313; Palcheski v. Brooklyn Heights R. R. Co., 69 App. Div. 440, 74 N. Y. Supp. 987. It is proper to note that this machinery had been in practically the same condition, with the same guard rail, for 11 years, with employés passing and repassing daily over this platform to and from the engine room, and no accident had ever occurred. It is also to be noted that the duty of the deceased did not call him in close proximity to this wheel. He was only required to place grease in these cups which were over this bearing, and that could easily be done if he stood in the center of the platform and some distance from the revolving wheel.

The complaint sets out a cause of action within the employer's liability act (chapter 600, p. 1748, Laws of 1902). Section 3 of that act provides:

"The question whether the employee understood and assumed the risk of such injury, or was guilty of contributory negligence, by his continuance in the same place and course of employment with knowledge of the risk of injury shall be one of fact, subject to the usual powers of the court in a proper case to set aside a verdict rendered contrary to the evidence."

The effect of this provision is not to relieve the plaintiff from showing freedom from contributory negligence, nor does it require the submission to the jury of this question where there is an utter absence of proof tending to establish the exercise of care by the person injured. Submission to a jury implies controverted facts, or circumstances from which contrary inferences may fairly be drawn. The isolated fact that an employé was killed in the course of his employment does not of itself permit a jury to find that the employé was free from fault contributing to his death. The plaintiff must show affirmatively freedom from negligence, and, if he utterly fails in this essential part of his case, the duty of the court to nonsuit still remains in spite of the employer's liability act, for the reason that there is no fact to submit to the jury. The power of the court "to set aside a verdict rendered contrary to the evidence" implies a disputed question of fact, and does not meet the case where there is no evidence exculpating the employé from blame.

The judgment and order should be reversed, and a new trial ordered, with costs to the appellant to abide the event.

Judgment and order reversed, and new trial granted, with costs to appellant to abide event, upon questions of law only, the facts having been examined, and no error found therein. All concur.